H.F. Allen ORCHARDS, et al.

v.

The UNITED STATES.

Elbert B. SCHINMANN, et al.

v.

The UNITED STATES.

R.E. REDMAN & SONS, INC.

v.

The UNITED STATES.

Nos. 113–80C, 226–80C and 36–81C.

United States Claims Court.

Feb. 21, 1984.

Burton J. Goldstein, San Francisco, Cal., attorney of record, for plaintiff.

Cheryl S. Rome, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant, David M. Cohen, Director, Washington, D.C., and Robert S. Burr, Office of the Field Sol., Portland, Or., of counsel.

OPINION ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

PHILIP R. MILLER, Judge:

In these three consolidated cases approximately 160 plaintiffs seek damages from the United States for breach of claimed contract obligations by the United States Bureau of Reclamation (the Bureau) to inform them accurately in February 1977 as to the total quantity of water it expected to be able to supply to them for irrigation purposes during the 1977 growing season. Plaintiffs assert that because the Bureau understated the quantity of water available it caused them to plant fewer crops than they could have had they received accurate estimates, to their financial detriment. The government defends upon a number of grounds, including: (1) That the Bureau had no such contractual obligation; (2) that plaintiffs neither had a contract with the Bureau nor were third-party beneficiaries entitled to sue under the contracts of their irrigation districts with the Bureau; (3) that plaintiffs failed to exhaust the administrative remedies provided for in the contract between the districts and the Bureau; (4) that under the terms of such contracts the government is absolved from liability for the claimed breach; (5) that this court lacks jurisdiction because the claims sound in tort; and (6) that to the extent plaintiffs rely on the terms of a consent decree in a district court action for the meaning of the contract provisions, exclusive jurisdiction to interpret the decree is reserved by the decree to the district court.

It is determined herein that defenses (1) and (2) are valid. Accordingly, it is unnecessary to rule on the validity of the other defenses.

## FACTS

Plaintiffs are both natural persons and corporations who farm in an area of eastern Washington state drained by the Yakima River. They are some of the members of ten Yakima Project irrigation districts.[1]

The Yakima Project consists of 250 miles of rivers in the Yakima Basin system. It includes six man-made or enhanced storage reservoirs with storage capacity of approximately 1,070,700 acre-feet (a.f.) of water and benefits approximately 500,000 acres of irrigated land. The Project stores, diverts, and delivers irrigation water through its Project works into the works of the various participating irrigation districts. Water is channeled from storage reservoirs and the Yakima River and its tributaries, to the head gates of the districts. The districts then channel the water into their main irrigation district canals, allocate it among their members and deliver it through their own distribution systems to the individual farms and fields. The United States is not involved in the delivery to, or the allocation of water among, or assessment of members by the districts. Individual water users within the districts are not billed by the United States but by the districts proportionately for the water used.

The Yakima Project was first authorized by the Secretary of the Interior in 1905, pursuant to the Reclamation Act of 1902, 32 Stat. 390 (now embodied throughout 43 U.S.C. ch. 12 (1976)). Although originally the Bureau contracted directly with some individual Project water users for a period of time, it now contracts with water user organizations only, usually irrigation districts organized under Washington State law. The charges made by the Bureau to the districts cover amortization of project construction costs as well as the federal government's operating and maintenance costs.

In 1939 a suit for declaratory judgment was instituted in the United States District Court for the Eastern District of Washington (*Kittitas Reclamation District v.*

*Sunnyside Valley Irrigation District,* Civil No. 21) to determine the obligation of the Bureau to deliver water to the Sunnyside Valley Irrigation District. Thereafter, a cross-complaint was filed in the case requesting the district court to determine the respective water rights of all the users of the waters of the Yakima River and its tributaries.

During the pendency of this action, a decision was issued by the Court of Appeals for the District of Columbia which dealt with the same Yakima Reclamation Project. *Fox v. Ickes,* 137 F.2d 30 (D.C.Cir.), *cert. denied* 320 U.S. 792, 64 S.Ct. 204, 88 L.Ed. 477 (1943). It held that under the Reclamation Act, the water rights of the irrigation districts and water users were property rights to the extent they could beneficially use the water and, accordingly, the Secretary of the Interior was barred from posting charges for water usage in order to pay for additional construction costs in excess of the construction charges authorized by statute. While the Bureau was not obligated to furnish any more water than was available, the court determined that the Bureau was obligated to distribute the available water according to the priorities of the parties that had been established according to the law of the State of Washington.

After the decision in *Fox v. Ickes,* the parties in the Kittitas Reclamation case elected not to continue the adjudication of the issue of the actual priorities of the individual water users, but instead agreed in 1945 upon a consent decree to be entered by the United States District Court for the Eastern District of Washington. The decree set forth both the allotment of water to the various irrigation districts in normal years and a procedure for allocation of the total water supply available in times of water shortage. It defined the "Total Water Supply Available" (TWSA) as:

> That amount of water available in any year from natural flow of the Yakima River, and its tributaries, from storage in the various Government reservoirs on the

---

1. Such irrigation districts are: Grandview, Granger, Kennewick, Kittitas, Outlook, Pros- ser, Roza, Sunnyside Valley, Yakima-Tieton and Zillah.

Yakima watershed and from other sources, to supply the contract obligations of the United States to deliver water and to supply claimed rights to the use of water on the Yakima River, and its tributaries, heretofore recognized by the United States.

Irrigation districts holding senior contract rights and others holding historically recognized rights, designated as "non-proratables", were to receive all of their decreed amounts to the extent possible from TWSA prior to those holding junior or "proratable" rights. Some districts are entirely non-proratable; others have both non-proratable and proratable rights. Plaintiffs all claim to be members of proratable districts.

After the entry of the 1945 consent decree redefining the irrigation water supply entitlements to the various districts and establishing the proratable classifications, the Bureau executed new or amended contracts with all irrigation districts within the Yakima Project. The contracts referred to the consent decree and incorporated portions of it either verbatim or by reference.

In 1977 there was a water shortage in the Yakima area because of drought and low snow pack. Precipitation averaged only about one-third of normal for several months prior to March. At the beginning of 1977, the Yakima area snow pack was only 4 percent of normal. Although the Bureau generally puts little or no reliability on forecasts in any year until April or May, the irrigation districts, with which the Bureau had several meetings, were eager to know what the Bureau's preliminary estimate would be. Accordingly, on February 7, 1977, the Bureau issued a TWSA estimate of 1,220,000 a.f., including 860,000 a.f. of storage and 360,000 a.f. of runoff. The Bureau's TWSA forecast projected continuation of the approximately one-third of normal precipitation which it had been experiencing for several months. Under this preliminary TWSA estimate the districts would receive 100 percent of their non-proratable entitlement and 6 to 7 percent of the proratable allotment. Recognizing that more favorable precipitation had occurred in

March, generating increased snow pack, on April 7, 1977, the Bureau upgraded the TWSA forecast to 1,390,000 a.f., with proratables projected to receive approximately 13 percent of their normal supply of water. Due to increased precipitation in March, April and May, greater runoff resulting from warm April temperatures, greater percentage of return flow than had been projected and diversions of water well below the usual amount at that time of the year, on May 17, 1977, the Bureau updated its TWSA estimate by approximately 350,000 a.f., to a total of approximately 1,740,000 a.f., projecting a 50 percent supply for the wholly proratable districts. By July 1, 1977, the Bureau's estimate of the TWSA made available from February to July 1, 1977 was 2,070,000 a.f., an increase of 850,000 a.f. over the February estimate. This resulted from revised findings as to return flow, smaller diversions and 500,000 a.f. added by additional precipitation throughout the spring and summer. For the entire irrigation year the proratables received 70 percent of their normal water supply.

Plaintiffs concede that they received all of the water to which they were entitled during 1977. Their complaint is only with respect to the underestimate in February. Plaintiffs claim that the low forecast of TWSA made in February 1977 was due to the Bureau's failure to include projected excess return flow from the irrigation canals and ditches. Plaintiffs contend that the contracts between the Bureau and the various irrigation districts of which they are members obligate the Bureau to make accurate forecasts of TWSA and that the failure to make such an accurate estimate in February 1977 was a breach of the various contracts.

Defendant denies that there was any such contractual obligation. It asserts that it made the forecast in February 1977 voluntarily as a sovereign act rather than as a contractual requirement, in order to accommodate the farmers; that the forecast did not omit any pertinent factor in estimating the TWSA; that it was as accurate as could reasonably be accomplished with the infor-

mation available in February; and that the revisions thereafter were made in the light of changed circumstances.

## DISCUSSION

### I

After the parties had submitted their briefs in support of their cross-motions for summary judgment, on August 30, 1983, the court filed an order, which, after taking note of plaintiffs' admission in their brief that "This is not a case in which the damage was really caused by a shortage of water", stated in part as follows:

> Plaintiffs allege that defendant breached an obligation to each plaintiff to furnish a proper estimate of total water supply available. Plaintiffs are directed to file a statement containing the appropriate record references to the provisions in each contract supporting the existence of such an obligation.

In their responses plaintiffs asserted the following as the basis for their allegation:

(a) The obligation of the United States to furnish a proper estimate of total water supply available has its genesis in the consent decree of January 31, 1945, in the case of *Kittitas Reclamation District, etc. v. Sunnyside Valley Irrigation District, et al.,* (E.D.Wash., Civil Action No. 21). The decree provides that in the event the TWSA is insufficient, the Bureau is to diminish proportionately the amount of water going to each of the irrigation districts of which the plaintiffs are members.

(b) All the irrigation districts to which the plaintiffs belong are subject to the provisions of the 1945 consent decree, and in many instances the post-1945 contracts between their districts and the United States refer to the consent decree.

(c) The provisions of many of the post-1945 contracts as well as the consent decree necessarily impliedly require the government's Project officer to compute TWSA because it is essential in order to make the proper prorations to the districts.

(d) Communication of the Bureau's TWSA computations to the farmers is also

an implied requirement of the consent decree and the water supply contracts, because (i) they specify that water deliveries are to commence generally in April of each irrigation season, and because (ii) the farmers must know how much water will be available to them well before April 1 so that they may be able to plan crops and acreage to be planted, the irrigation methods to be used and other crucial farming decisions. Therefore the value of the farmer's contractual right to irrigation water is conditioned upon timely notice of the amount of water to be allocated to them.

Plaintiffs' reasoning is not persuasive.

█ Plaintiffs fail to point to a single provision in any of the contracts wherein the Bureau expressly obligated itself or the United States to furnish to plaintiffs any advance estimate or forecast of the total water supply available for irrigation purposes during the entire growing season.

Contracts are, of course, the expressions of mutual intent and agreement, and, in the absence of any express provision therefor in these contracts, there is no basis for imputing to the United States the assumption of an obligation not merely to make such forecasts but to do so with accuracy or else subject itself to liability for large sums in damages.

Lacking an express promise by the government, plaintiffs argue that because such an accurate annual forecast would be valuable to the farmers a promise by the government to furnish it or pay damages should be implied. But the major obstacle to such an argument is that there is no proof that the government ever agreed to such an obligation or even intended to do so.

With respect to the situation where there is no written contract whatsoever between the parties, *Pacific Gas & Elec. Co. v. United States,* 3 Cl.Ct. 329, 338–39 (1983), aptly summarizes the requirements for the United States to be deemed to have entered into an implied contract as follows:

A contract implied-in-fact requires a showing of the same mutual intent to contract as that required for an express contract. The fact that an instrument was not executed is not essential to consummation of the agreement. It is essential, however, that the acceptance of an offer be manifested by conduct that indicates assent to the proposed bargain. The requirements of mutuality of intent, and the lack of ambiguity in offer and acceptance, are the same for an implied-in-fact contract as for an express contract; only the nature of the evidence differs. The officer whose conduct is relied upon must have had actual authority to bind the Government in contract. It is plaintiff's burden to prove that an implied-in-fact contract was made. Extensive negotiations in which the parties demonstrate hope and intent to reach an agreement are not sufficient in themselves to establish a contract implied-in-fact. [Citations omitted.]

And *see also Baltimore & Ohio R.R. v. United States,* 261 U.S. 592, 597, 43 S.Ct. 425, 426–427, 67 L.Ed. 816 (1923); *Porter v. United States,* 204 Ct.Cl. 355, 365, 496 F.2d 583, 590 (1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975); and *Prevado Village Partnership v. United States,* 3 Cl.Ct. 219, 223–24 (1983).

■ Plaintiffs' burden of establishing an implied promise is all the more difficult where the parties contemplate that their contractual relationship arises by means of a written agreement. As one authority states:

Only the least thought is necessary to realize that a "gap" in an agreement should not be filled merely because a gap exists. * * * A promise that is not there in language, or an unexpressed condition of an express promise, should be put in by process of implication only when the conduct of the parties reasonably interpreted already has expressed it.

(3 *A. Corbin on Contracts,* § 569, at 341 (1960).)

The pertinent case law on implied promises is similarly summarized in 17 Am. Jur.2d, *Contracts,* § 255, at 651–52 (1964):

where a contract is reduced to writing, it is generally held, in the absence of mistake or fraud, that the written contract includes or embodies the whole agreement of the parties and all material provisions, and that, therefore, no additional agreements, obligations, or warranties can be implied. If there is to be any implication, it must result from the language employed in the instrument or be indispensable to carry the intention of the parties into effect. Terms are to be implied in a contract, not because they are reasonable, but because they are necessarily involved in the contractual relationship so that the parties must have intended them and have only failed to express them because of sheer inadvertence or because they are too obvious to need expression. Insofar as it indicates anything, the absence of a particular provision from a contract indicates an intention to exclude it rather than intention to include it. No implied obligation can exist under a contract upon a point which it is apparent was not in the minds of the parties when the contract was executed, and nothing can be implied from a contract which could not have been lawfully expressed therein.

And *see also Somerville Technical Services v. United States,* 226 Ct.Cl. 291, 300, 640 F.2d 1276, 1281 (1981); *Somali Development Bank v. United States,* 205 Ct.Cl. 741, 751, 508 F.2d 817, 822 (1974); *Hudson Canal Co. v. Penna. Coal Co.,* 75 U.S. (8 Wall) 276, 19 L.Ed. 349 (1868); *Danciger Oil & Ref. Co. of Texas v. Powell,* 137 Tex. 484, 154 S.W.2d 632 (1941); *Ives v. City of Willimantic,* 121 Conn. 408, 185 A. 427 (1936); and *Domeyer v. O'Connell,* 364 Ill. 467, 4 N.E.2d 830 (1936).

Plaintiffs have failed to supply any factual predicate from which it may be concluded that the Bureau impliedly obligated itself to make such advance estimates or forecasts. Periodic computation of the TWSA may be necessary to enable the Bureau to make the proper prorations of the

water among the irrigation districts as it becomes available. But plaintiffs have not demonstrated any discernible need for an advance estimate or forecast for the whole growing season in order to enable the Bureau to distribute the water properly. Nor have plaintiffs demonstrated any other reason why the Bureau would have been willing to obligate itself to make such a forecast on pain of liability for damages if it is mistaken or inaccurate.

■ Finally, even if such a promise could be implied, it would not be binding on the government, since plaintiffs have failed to show that any government officer had authority to obligate the United States to an agreement to make accurate advance forecasts of the total water which would be available for the growing season in the Yakima River basin or to pay damages for its breach. The authority of the Secretary of the Interior to enter into contracts with state irrigation districts for payment of charges is contained in 43 U.S.C. §§ 511–26 (1976). Nowhere do these sections authorize the Secretary or his delegate to bind the government to the making of accurate annual advance forecasts of the total water to be made available for the growing season.

■ The officer whose promise is relied upon by plaintiffs must have had actual authority to bind the government to that promise. *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *Schweiker v. Hansen,* 450 U.S. 785, 788–89, 101 S.Ct. 1468, 1470–1471, 67 L.Ed.2d 685 (1981); *Haight v. United States,* 209 Ct.Cl. 698, 538 F.2d 346, *cert. denied,* 429 U.S. 841, 97 S.Ct. 116, 50 L.Ed.2d 110 (1976). "The claimant for money damages for breach of an express or implied in fact contract must show that the officer who supposedly made the contract had authority to obligate appropriated funds." *Kania v. United States,* 227 Ct.Cl. 458, 465, 650 F.2d 264, 268, *cert. denied,* 454 U.S. 895, 102 S.Ct. 393, 70 L.Ed.2d 210 (1981). It is a "time-honored principle that the Federal Government is not bound by its agent acting beyond his authority * * *."

*National Bank of South Carolina v. United States,* 223 Ct.Cl. 573, 577, 621 F.2d 1109, 1111 (1980).

## II

■ Assuming that the irrigation contracts could be construed to provide for the making of the advance estimates, plaintiffs would still not be entitled to recover herein, because the contracts given them no enforceable rights against the United States. Even where a person receives a substantial financial benefit from the government's performance of a contract, he is not entitled to recover for its breach absent a showing that he has privity of contract with the United States or that he is a direct third-party beneficiary of such contract. *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1550–51 (Fed.Cir.1983); *Somerville Technical Services v. United States, supra,* 226 Ct.Cl. at 301, 640 F.2d at 1282; *Housing Corp. of America v. United States,* 199 Ct.Cl. 705, 712–13, 468 F.2d 922, 925–26 (1972); *D.R. Smalley & Sons, Inc. v. United States,* 178 Ct.Cl. 593, 372 F.2d 505, *cert. denied,* 389 U.S. 835, 88 S.Ct. 45, 19 L.Ed.2d 97 (1967). The contracts upon which plaintiffs rely are contracts between the United States and the irrigation districts of which plaintiffs are only some of the members, not between the United States and plaintiffs. Hence there is no privity between the plaintiffs and the United States.

■ Plaintiffs contend that they are actually the principals and that the irrigation districts are merely their agents in the contracts with the United States. But for this to be true, the districts would have to be *mere* agents; agree with the principals to follow their directions exclusively; own no property of their own; and have no authority to make independent decisions through their own officers. *See National Carbide Corp. v. Commissioner,* 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949); *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943); and *Vaughn v. United States,* 3 Cl.Ct. 316 (1983).

■ There is little or nothing in the record which can support such a scenario. It is well established that irrigation districts are public corporations or local governmental units organized under authority of state statutes for the purpose of appropriating, regulating, controlling, and distributing water for irrigation, by the owners of the land to be irrigated. *Fallbrook Irrigation District v. Bradley,* 164 U.S. 112, 17 S.Ct. 56, 41 L.Ed. 369 (1896); and see *Salyer Land Co. v. Tulare Water District,* 410 U.S. 719, 723, 93 S.Ct. 1224, 1227, 35 L.Ed.2d 659 (1973); and 3 *C. Kinney on Irrigation and Water Rights,* § 1404 (2d ed. 1916).

In the State of Washington the organization of an irrigation district is strictly controlled by state law (Wash.Rev.Code Ann. § 87.03.030 (1962)). It requires the county commissioners to supervise the election and approval by two-thirds of the qualified landholders in the proposed district (§ 87.-03.035–050). It is operated by a board of directors elected by the landholders, who in turn elect the officers (§ 87.03.115). The board is granted the usual powers to make contracts and all necessary rules and regulations for the conduct of the affairs of the district (§ 87.03.115). It is also given the power to acquire, "either by purchase or condemnation, or other legal means, all lands, and waters, water rights, and other property necessary" for irrigation projects (§ 87.03.140). Money may be borrowed and bonds issued for the payment of the same upon approval of the voters (§ 87.03.200). All of the real property in the district may be assessed for the purposes of the district (§ 87.03.240). The boundaries of the district may be changed and lands added or excluded (§ 87.03.555–03.695). A district is specifically authorized "To construct, repair, purchase, maintain or lease a system for the sale or lease of water to the owners of irrigated lands within the district for domestic purposes" and "To assume, as principal or guarantor, any indebtedness to the United States under the federal reclamation laws, on account of district lands" (§ 87.03.015).

Title 43 U.S.C. §§ 511 and 523 (1976) authorize the Secretary of the Interior to contract with such legally authorized irrigation districts for the impounding, storage, distribution and delivery of water to such districts in return for payments by the districts for the construction and maintenance of reservoirs, irrigation works, canals and distribution systems. Section 423e prohibits the delivery of water upon the completion of any new project or new division of a project initiated after May 25, 1926, until a contract in a form approved by the Secretary shall have been made with an irrigation district providing for payment by the district of the cost of constructing, operating and maintaining the works during the time they are in control of the United States. All of the contracts at issue were entered into or amended after 1926, and plaintiffs do not contend that they are not subject to § 423. Thus, plaintiffs have failed to demonstrate that the Secretary of the Interior or his delegate was even authorized to contract with the individual plaintiffs as principals, let alone intended to do so.

Moreover, the contracts themselves are entirely inconsistent with any such theory. There is no evidence of any agreements between the members or water users and the irrigation districts that the latter are to act as mere agents of the former. Each contract is executed by the irrigation district in its own name and specifically designated as a contract between the United States and the district. In each contract the United States agrees to deliver water to the irrigation district, and it is the latter which has the responsibility for the allocation and distribution of the water to the members of the district. In turn the district agrees to repay the United States periodically and in installments for the government's construction of its reservoirs, dams and irrigation works and its operating and maintenance costs in connection with the water supply, distribution and delivery systems. The method of allocation and distribution of the water to the individual users is not provided for in the contract, but is the responsibility of the district. While, of course, the district obtains its funds from

its members or water users, there is no necessary correlation between the amounts paid the United States and the amounts assessed by the district or levied against the users, since the district may also have its own operating and maintenance costs. Furthermore, in each of the contracts there is a clause which in substance states the following: "Nothing in this contract shall be deemed to relieve the District in any way of its general obligation to pay the United States the full amount owed to the United States hereunder, regardless of delinquencies in payment of assessments and charges by the landowner to the District." [2]

Plaintiffs claim that they are principals and the irrigation districts mere agents because the contracts recite that the district is "the duly authorized representative" of the user. However, even if this could be equated to "agent", it would not control over the substance of the contracts. Fair analysis of the contracts requires the conclusion that the irrigation districts are representatives of the water users only in the sense that municipal corporations generally represent the residents of a municipality or membership corporations represent their members.

Plaintiffs' claim that they are entitled to sue the United States as third-party beneficiaries of the contracts between the government and the irrigation districts is also meritless. While this court has jurisdiction of a suit on a contract by an intended third-party beneficiary of the contract (*Hebah v. United States,* 192 Ct.Cl. 785, 792, 428 F.2d 1334, 1339 (1970)), an individual who is not a party to an agreement does not have the right to sue for breach of that agreement merely because he would benefit from its performance or because it would be beneficial to him to have the right. *German Alliance Ins. Co. v. Home Water Supply Co.,* 226 U.S. 220, 230, 33 S.Ct. 32, 35, 57 L.Ed. 195 (1912); *Robo Wash, Inc. v. United States,* 223 Ct.Cl. 693, 697–98 (1980); *Ables v. United States,* 2 Cl.Ct. 494, 500 (1983), aff'd, 732 F.2d 166 (Fed.Cir.1984). And *see*

also 4 *A. Corbin on Contracts,* § 775, at 8 (1951) and 17 Am.Jur.2d, *Contracts,* § 304.

Plaintiffs' claim is based on nothing more than the reasoning that, because the contracts for the orderly distribution of water by the United States to the districts were designed to enable the districts to make subdistributions to their members, the individual members are the ultimate beneficiaries of the contracts, and hence each is entitled to sue the United States individually for any breach of the contract between the district and the United States.

The major fallacy in the plaintiffs' reasoning is that it ignores the fact that in incorporating the districts to contract on behalf of their members collectively with respect to their water rights, the members exchanged their rights to enforce and protect their individual interests for interests in the public corporations, in the same way that members or shareholders generally do when they combine their interests in to membership or business corporations. Most corporate contracts are entered into for the benefit of their members or shareholders, but if for that reason alone each member was entitled to sue individually for an alleged breach affecting all, irrespective of whether the corporation or a majority of the members thought there was such a breach, it would authorize multitudinous litigation and be destructive of the conception of the corporation as an entity separate from its members or shareholders.

Members or shareholders are not *per se* excluded from being third-party beneficiaries of corporate contracts entitled to enforce their individual rights against promisors. But obviously more than the mere inuring of benefit from performance is required for them to be entitled to do so. There must be some manifestation of intent between the parties to the contract that if the promisor defaults the members or shareholders will be compensated directly by the promisor. W. Fletcher, *Cyclopedia*

---

**2.** From contract between the United States and the Prosser Irrigation District, executed November 25, 1949, par. 24.

of the Law of Private Corporations, §§ 5911, 5923 (rev. perm. ed. (1980) and 1983 Supp.). Schaffer v. Universal Rundle Corp., 397 F.2d 893, 896 (5th Cir.1968); Robo Wash, Inc. v. United States, 223 Ct.Cl. 693, 697 (1980); Howell v. Fisher, 49 N.C. App. 488, 272 S.E.2d 19 (1980), pet. for review denied, 302 N.C. 218, 277 S.E.2d 69 (1981); Sutter v. General Petroleum Corp., 28 Cal.2d 525, 170 P.2d 898 (1946).

This rule is given particular emphasis where the claimed third-party beneficiary is asserting his right as one of many members or inhabitants of a governmental entity, such as the United States, a state, a municipality, or an irrigation district as is here involved. As is pointed out in Calamari & Perillo on Contracts, § 247 (at 387 (1970)) "Every contract made by a governmental unit is made for the benefit of its inhabitants. If a city contracts to have a police station, firehouse, tax office or park built, it does so to enhance the general welfare and, thus, to benefit the public. Yet, in such a case, no individual inhabitant has a right to enforce the contract on his own behalf." Accordingly, it is only where the contract between the public corporation and the promisor manifests the specific intent to give the individual an enforceable right to compensation for its breach that he may sue thereon.

The leading case with respect to this rule is German Alliance Ins. Co. v. Home Water Supply, 226 U.S. 220, 33 S.Ct. 32, 57 L.Ed. 195 (1912). There an insurance company as assignee of the owner of a number of houses, brought suit against a water company for losses caused by a fire which it claimed were attributable to the water company's failure to comply with its contract with the city of Spartanburg to furnish adequate water supplies and pressure for city fire hydrants. In denying the right of the plaintiff to sue as a third-party beneficiary of the city's contract with the water company, the court explained (226 U.S. at 230–31, 33 S.Ct. at 35):

> Before a stranger can avail himself of the exceptional privilege of suing for a

breach of an agreement, to which he is not a party, he must, at least show that it was intended for his direct benefit. * *

Here the city was under no obligation to furnish the manufacturing company with fire protection, * * * but, like other municipal contracts, was made by Spartanburg in its corporate capacity, for its corporate advantage, and for the benefit of the inhabitants collectively. The interest which each taxpayer had therein was indirect—that incidental benefit only which every citizen has in the performance of every other contract made by and with the government under which he lives, but for the breach of which he has no private right of action.

The underlying rationale of German Alliance Ins. Co. was restated succinctly by Justice Cardozo, as a member of the New York Court of Appeals, in a case involving similar facts (H.R. Moch Co. v. Rensselaer Water Co., 247 N.Y. 160, 164–65, 159 N.E. 896, 897 (1928)):

> In a broad sense it is true that every city contract, not improvident or wasteful, is for the benefit of the public. More than this, however, must be shown to give a right of action to a member of the public not formally a party. The benefit, as it is sometimes said, must be one that is not merely incidental and secondary. * * * It must be primary and immediate in such a sense and to such a degree as to bespeak the assumption of a duty to make reparation directly to the individual members of the public if the benefit is lost. The field of obligation would be expanded beyond reasonable limits if less than this were to be demanded as a condition of liability. * * *
>
> By the vast preponderance of authority, a contract between a city and a water company to furnish water at the city hydrants has in view a benefit to the public that is incidental rather than immediate, an assumption of duty to the city and not to its inhabitants.[3]

---

**3.** For other cases following the majority rule

that private citizens may not bring a breach of

The American Law Institute's *Restatement of the Law Contracts, Second* (1981), codifies this rule as follows:

§ 313. Government Contracts

\* \* \* \* \* \*

(2) In particular, a promisor who contracts with a government or governmental agency to do an act for or render a service to the public is not subject to contractual liability to a member of the public for consequential damages resulting from performance or failure to perform unless

(a) the terms of the promise provide for such liability; or

(b) the promisee is subject to liability to the member of the public for the damages and a direct action against the promisor is consistent with the terms of the contract and with the policy of the law authorizing the contract and prescribing remedies for its breach.

Comment:

*a. Rationale.* \* \* \* Government contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested. In case of doubt, a promise to do an act for

or render a service to the public does not have the effect of a promise to pay consequential damages to individual members of the public unless the conditions of Subsection (2)(b) are met.[4]

Recent cases applying the same rule include *Miree v. United States,* 538 F.2d 643 (5th Cir.1976), *per curiam on rehearing en banc,* adopting the dissenting opinion of Judge Dyer in the same case at 526 F.2d 679, 686–88 and *Miree v. United States,* 242 Ga. 126, 249 S.E.2d 573 (1978) (Persons suffering injury in an airplane accident at a county operated airport not entitled to sue the county for breach of a contract between the county and the Federal Aviation Administration to operate the airport safely, because the contract did not manifest an intention that members of the public be compensated);[5] *Commonwealth of Pa. v. National Ass'n of Flood Ins.,* 378 F.Supp. 1339 (M.D.Pa.1974), *aff'd in part and rev'd in part,* 520 F.2d 11 (3rd Cir.1975), and *Schell v. National v. National Flood Insurers Ass'n,* 520 F.Supp. 150 (D.Colo.1981) (Contract between Secretary of Housing and Urban Development and insurers provided no basis for suit by third-parties

contract action against a water company for a loss by fire because of the water company's failure to perform its contract with a municipality to furnish an adequate supply of water, *see* 78 Am.Jur.2d, *Waterworks and Water Companies,* § 51 (at 938–39 (1975)).

4. The original *Restatement of the Law of Contracts* (1932) is similar. It provides:

§ 145. Beneficiaries Under Promises To The United States, A State, Or A Municipality.

A promisor bound to the United States or to a State or municipality by contract to do an act or render a service to some or all of the members of the public, is subject to no duty under the contract to such members to give compensation for the injurious consequences of performing or attempting to perform it, or of failing to do so, unless,

(a) an intention is manifested in the contract, as interpreted in the light of the circumstances surrounding its formation, that the promisor shall compensate members of the public for such injurious consequences, or

(b) the promisor's contract is with a municipality to render services the non-perform-

ance of which would subject the municipality to a duty to pay damages to those injured thereby.

5. After the decision of the 5th Circuit in *Miree,* at 538 F.2d 643, the Supreme Court vacated the judgment and remanded the case to the court of appeals for consideration of the claim under Georgia law rather than federal common law, for lack of a federal interest in the case. *Miree v. Dekalb County,* 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977). On remand the court of appeals certified the question of state law to the Georgia Supreme Court. *Miree v. United States,* 565 F.2d 1354 (5th Cir.1978). The latter then held that under Georgia law likewise the mere fact that a member of the public would have benefited from the performance of the contracts does not create third-party intended beneficiary status, and that there was no intention manifested in the contracts that the county compensate any member of the public for injurious consequences. *Miree v. United States,* 242 Ga. 126, 249 S.E.2d 573 (1978). Thereupon the court of appeals affirmed the decision of the district court dismissing the plaintiffs' suit against the county. 588 F.2d 453 (5th Cir. 1979).

against latter for breach of duty to publicize availability of flood insurance, because of absence of manifestation of intent to compensate or to be liable to members of public for breach of any such duty); *Martinez v. Socoma Companies, Inc.*, 11 Cal.3d 394, 113 Cal.Rptr. 585, 521 P.2d 841 (1974) (Persons certified by federal government as disadvantaged not entitled to sue corporation for breach of contract with United States to provide job training and employment to such class of persons, because the contracts manifested no intent that defendant compensate plaintiffs or other members of public for nonperformance); *Matternes v. City of Winston-Salem*, 286 N.C. 1, 209 S.E.2d 481 (1974) (Plaintiff suing city for wrongful death of minor caused by accumulation of ice on a bridge not entitled to recover under city's contract with state to maintain the state highway system because of absence of specific intent to make plaintiff third-party beneficiary of such contract); *Davis v. Nelson-Deppe, Inc.*, 91 Idaho 463, 424 P.2d 733 (1967) (Truck owner could not maintain contract action as third-party beneficiary for damages to equipment which went off a highway being reconstructed by defendant under contract with state highway department, because of absence of third-party beneficiary intent in contract); *United Dispatch v. E.J. Albrecht Co.*, 135 W.Va. 34, 62 S.E.2d 289 (1950) (Building owner not entitled to recover for damage to building as third-party beneficiary of defendant's contract with United States for construction of concrete wall and levee along river bank for flood protection to city, absent evidence of specific intent).

For a variety of reasons it is perfectly clear that in entering into the irrigation contracts neither the United States nor the irrigation districts intended that an individual member of the district be entitled to maintain an action against the United States for a breach.

First, there is no express provision in any of the contracts manifesting any such intent.

Second, 43 U.S.C. § 423e (1976) provides that every federal contract for the delivery of water must be made with an irrigation district organized under state law. Thus no officer had authority on behalf of the United States to contract with an individual member of such a district. What the federal officers have not been authorized to do directly they may not be deemed to have been authorized to accomplish indirectly by making district members third-party beneficiaries entitled to enforce the contracts on their own behalf. *United States v. National Surety Corp.*, 309 U.S. 165, 60 S.Ct. 458, 84 L.Ed. 677 (1940); *Ables v. United States*, 2 Cl.Ct. 494, 501 (1983), *aff'd*, 732 F.2d 166 (Fed.Cir.1984); *Frangella Mushroom Farms, Inc. v. United States*, 229 Ct.Cl. 578, 582 (1981), *cert. denied*, 456 U.S. 916, 102 S.Ct. 1771, 72 L.Ed.2d 175 (1982).

Third, the various contracts contain a clause making the Secretary of the Interior arbiter of disputes between the parties arising out of the contract involving questions of fact, and his decision is to be conclusive as against the parties.[6] The contracting parties could hardly have intended that the irrigation district be subject to such clause while at the same time any member of the district may disregard it by asserting the same claim as a third-party beneficiary.

Fourth, the contracts contain an exculpatory clause, holding the United States harmless from liability for damages arising by reason of shortages in irrigation water resulting from distribution or any other causes.[7] To allow a member of a district to

---

6. The Amendatory Contract between the United States and the Prosser Irrigation District contains the following typical provision:
*Secretary Arbiter of Disputes Involving Questions of Fact*
   44. In the event of disputes between the parties hereto arising out of this contract involving questions of fact, and, so far as the provisions hereof require a determination of fact to be made, the Secretary is hereby designated as the arbiter of such questions and as the one required to make such determination of facts and his decision thereon shall be conclusive as against the parties hereto.

7. The same Prosser contract sets forth the following typical clause:
   33. No liability shall accrue against the United States or any of its officers, agents or employees for damage, direct or indirect,

circumvent this restriction on the district by bringing suit in his own name would also be inconsistent with the intent of the signatories to the contract.

Fifth, absent an express provision entitling a third person not a party to a contract to enforce the provisions of the contract on his own behalf, in determining whether or not it could reasonably have been implied it is fair to consider the consequences of such an implied provision. It would subject the United States to the cost of defending multitudinous individual suits of varying natures with different measures and allocations of damages.[8] Moreover, it would allow individual members to assert claims for breach of contract which the contracting districts themselves and a majority of their members do not believe are proper. It is noteworthy that not a single district has joined in or otherwise supported plaintiffs' claims herein.[9] These are consequences which Congress obviously sought to avoid by the enactment of 43 U.S.C. § 423e.

### Conclusion

The pleadings, depositions, affidavits, admissions and other documents in the record show that there is no genuine issue as to any material fact and that defendant is entitled to judgment as a matter of law. Accordingly, plaintiffs' motions for summary judgment are denied. Defendant's cross-motions for summary judgment are allowed. It is ordered that judgments be entered dismissing the complaints, with costs to be awarded to defendant.

arising by reason of shortages in the quantity of water available through the irrigation system or interruptions in water deliveries to lands in the District resulting from drought, inaccuracy in distribution, hostile diversion, prior or superior claims, accident to or failure of facilities of the irrigation system, whether or not attributable to negligence of officers, agents or employees of the United States, or other causes of whatsoever kind. Nor shall the District's obligations to the United States under this contract be reduced by reason of such shortages or interruptions. In the event of such shortages or interruptions, the United States will, however, make every reasonable effort to remove promptly the cause thereof.

8. Plaintiffs do not state how many members or water users the ten irrigation districts have, but defendant asserts and plaintiffs do not deny that there are many thousands. Plaintiffs concede that they are a minority in each of the districts since they have been unable to persuade any district to bring suit on the same claim.

9. Cf. *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1549 (Fed.Cir.1983): "If direct access were allowed to all Government subcontractors, contracting officers might, without appropriate safeguards, be presented with numerous frivolous claims that the prime contractor would not have sponsored."