**TRANSAMERICA INSURANCE COMPANY**

v.

**The UNITED STATES;**

**George S. Rush, d/b/a Rush Engineers, Contingent Third-Party Defendant *.**

**No. 599–82C.**

United States Claims Court.

Oct. 3, 1984.

\* The court granted the defendant's motion that Mr. Rush be summoned as a contingent third-party defendant, and a summons was issued. The court has no information as to whether Mr. Rush was served.

Lewis B. Hollabaugh, Nashville, Tenn., for plaintiff.

Kathleen A. Flynn, Washington, D.C., with whom were Asst. Attys. Gen. J. Paul McGrath, Michael D. Morin, David M. Cohen, and Sandra P. Spooner, Washington, D.C., for defendant. Major Chadwell, U.S. Air Force, of counsel.

## ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

WHITE, Senior Judge.

The plaintiff, Transamerica Insurance Company (Transamerica), is a California insurance corporation that is authorized to write surety bonds for construction contracts. Transamerica sues in this action for an amount allegedly due under a takeover agreement in connection with a government contract on which it wrote payment and performance bonds, and which it completed when the contracting officer terminated the contract for default.

The case comes before the court at this time on the parties' cross-motions for summary judgment, supplemented by oral arguments.

### Agreed Facts

On December 27, 1979, George S. Rush, d/b/a Rush Engineers (Rush), was award-

ed a government contract to construct a shopping center building at Arnold Air Force Station, Tennessee. The original contract price was $2,148,100, and the scheduled completion date, as amended by modification, was August 18, 1981.

Also on December 27, 1979, Rush, as required by the contract, executed performance and payment bonds, with penal sums of $2,148,100 and $859,240, respectively. The surety for these bonds was Transamerica, the principal was Rush, and the obligee was the United States.

On January 30, 1980, Rush received notice to proceed with the work under the contract, and commenced performance.

By August 18, 1981, which was the scheduled completion date, Rush had completed only 71 percent of the work under the contract, and progress on the project had slowed. By means of a letter dated September 9, 1981, the contracting officer notified Rush that the contract was being terminated for default.

The contracting officer and representatives of Transamerica met on September 21, 1981, to discuss completion of the contract by Transamerica under its performance bond.

On October 5, 1981, the Government and Transamerica executed a takeover agreement. This document contained the following provisions (among others):

(1) that Transamerica would engage a contractor to complete the work "under the original contract in accordance with all the terms and conditions thereof";

(2) that the Government would pay Transamerica "in the manner provided by the contract, but not in excess of the Surety's cost and expenses, the balance of the contract price unpaid at the time of default," but subject to certain conditions; and

(3) that one of the conditions was to be as follows:

 a. Unpaid earnings of the defaulting contractor, including retained percent-

ages and progress estimates for work accomplished prior to termination, shall be subject to claims by the Government against the contractor, except to the extent that such unpaid earnings may be required to permit payment to the Surety of its actual costs and expenses incurred in the completion of the work, exclusive of its payments and obligations under the payment bond given in connection with the contract.

While the work of completing the contract was in progress, the Government discovered that, in making previous progress payments to Rush, it had mistakenly overpaid Rush to the extent of $79,810.74 above the amount properly due Rush on the work accomplished. This amount was subsequently withheld from a progress payment that was made to Transamerica's contracting agent. A claim by Transamerica for the $79,810.74 was denied by the contracting officer.

In the present action, Transamerica seeks to recover the $79,810.74 mentioned in the preceding paragraph.[1]

The total amounts paid by the Government to Rush and to Transamerica (including its contracting agent) equalled the contract price.

### The Plaintiff's Expenses

As previously indicated, the takeover agreement between the Government and Transamerica specifically provided that Transamerica, for its work in completing the contract, was not entitled to any payment "in excess of the Surety's cost and expenses."

█ Transamerica asserts, and the defendant denies, that Transamerica's costs and expenses in completing the work under the contract exceeded the amount which the Government paid Transamerica (including its contracting agent) for the work involved in the completion of the contract. This controversy between the parties over

---

**1.** The administrative claim and the complaint here asked for an additional amount of $2,070, but the plaintiff conceded at oral argument that the $2,070 was not due.

a material issue of fact—quite apart from other considerations—would prevent the court from granting the plaintiff's cross-motion for summary judgment. Under this court's Rule 56(c), summary judgment is proper only if there is no genuine issue as to any material fact and the papers before the court show that the moving party is entitled to a judgment as a matter of law.

### The Certification

In its motion for summary judgment and supporting brief, the defendant raises several objections to the plaintiff's complaint. One of the objections is that the court does not have jurisdiction over the plaintiff's claim because the claim (according to the defendant) was not certified by a proper official when submitted to the contracting officer.

The Contract Disputes Act provides in part as follows:

> * * * For claims of more than $50,000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable. [41 U.S.C. § 605(c)(1) (1982).]

■ Proper certification is a jurisdictional prerequisite to a direct-access action by a government contractor in this court if the claim submitted to the contracting officer exceeds $50,000. *W.M. Schlosser Co. v. United States*, 705 F.2d 1336, 1338 (Fed. Cir.1983); *W.H. Moseley Co. v. United States*, 230 Ct.Cl. 405, 406, 677 F.2d 850, 851, *cert. denied*, 459 U.S. 836, 103 S.Ct. 81, 74 L.Ed.2d 77 (1982).

A Defense Acquisition Regulation (32 C.F.R. § 1–314(L)(2) (1983)) requires that the certification "be executed by a senior company official in charge at the contract's plant or location involved, or by an officer and general partner of the general contractor having overall responsibility for the conduct of the contract's affairs."

The certification in the present case was executed on behalf of Transamerica by one Joseph Saad, who was described in the certificate merely as "Bond Claim Attorney." An affidavit by Mr. Saad that is before the court, however, states that he was "the senior company official in charge of all matters relating to Transamerica Insurance Company involved with * * * [the] Contract," and that he "had the overall supervision on behalf of Transamerica Insurance Co. of all the completion work on the * * * project."

■ It appears, therefore, that Joseph Saad was qualified to execute the certificate in support of Transamerica's claim before the contracting officer. Accordingly, the defendant's jurisdictional defense, based on the alleged lack of a proper certification of the plaintiff's claim, must be rejected.

### The $79,810.74 Mistake

The principal issue in the case is whether the Government acted properly in compelling Transamerica to bear the financial burden resulting from the Government's mistake in paying Rush $79,810.74 more than Rush was entitled to receive under the contract for the work accomplished by Rush.

In arguing that this should be answered in the negative, Transamerica relies principally on a series of cases which applied state law and held that a surety on a performance bond is discharged from its obligation to the extent that the owner has made unauthorized payments to the contractor, with resulting prejudice to the surety (citing *National Union Indemnity Co. v. G.E. Bass & Co.*, 369 F.2d 75 (5th Cir.1966), which applied Mississippi law, and other cases).

■ Such decisions are inapposite here. Transamerica has fulfilled its obligation under the performance bond, and is not seeking any sort of discharge from such obligation. Rather, it is seeking reimbursement for the costs and expenses which it allegedly incurred in completing performance of the contract following Rush's default.

Also, federal contracts are controlled by federal law, and not state law. *Penn-Ohio Steel Corp. v. United States*, 173 Ct.Cl. 1064, 1090, 354 F.2d 254, 269–70 (1965); *Baggett Transportation Co. v. United States*, 162 Ct.Cl. 570, 577, 319 F.2d 864, 868 (1963); *The Padbloc Co. v. United States*, 161 Ct.Cl. 369, 377 (1963).

■ The defendant also relies in part on the law of suretyship. It asserts in its brief that a surety's rights to contract funds are based upon its being subrogated to the contractor's rights (citing *United States Fidelity & Guaranty Co. v. United States*, 201 Ct.Cl. 1, 10, 475 F.2d 1377, 1382 (1973)); and that the doctrine of subrogation gives a surety no greater rights to the contract proceeds than the contractor has (citing *First National City Bank v. United States*, 212 Ct.Cl. 357, 369, 548 F.2d 928, 936 (1977)). Obviously, in the present case, Rush does not have any claim against the Government for the $79,810.74 which the Government mistakenly paid to Rush; and, therefore, according to the defendant's theory, Transamerica, which stands in the place of Rush, does not have any valid claim against the Government for this money. In this connection, however, it should be noted that a performance bond surety, such as Transamerica, which has completed the contract under its bond is not only a subrogee of the contractor, but it is also the subrogee of the owner. *Trinity Universal Insurance Co. v. United States*, 382 F.2d 317, 320 (5th Cir.1967), *cert. denied*, 390 U.S. 906, 88 S.Ct. 820, 19 L.Ed.2d 873 (1968).

■ Actually, the disposition of this issue does not depend upon the law of suretyship, as the parties entered into a takeover agreement which defined their respective rights and obligations in connection with the completion of the contract by Transamerica. In order to interpret this agreement, it is necessary to ascertain the intent of the parties to the agreement. *SCM Corp. v. United States*, 230 Ct.Cl. 199, 203, 675 F.2d 280, 283 (1982); *Dynamics Corporation of America v. United States*, 182 Ct.Cl. 62, 72, 389 F.2d 424, 429

(1968). This can only be accomplished by seeking an interpretation that gives reasonable meaning to all relevant portions of the agreement, without rendering any provision useless. *ITT Arctic Services, Inc. v. United States*, 207 Ct.Cl. 743, 751–52, 524 F.2d 680, 684 (1975).

The defendant refers to the provision of the agreement which placed a limitation of "the balance of the contract price unpaid at the time of default" on the amount that should be paid to Transamerica. The defendant contends that as the $79,810.74 now under consideration had already been paid (although erroneously) at the time of default, it must necessarily be excluded in determining any amount recoverable by Transamerica.

This provision of the agreement must be considered in connection with other provisions emphasizing that the parties were to be bound by the terms and conditions of the original contract. It seems reasonable to conclude that when the parties provided that Transamerica's reimbursement should be limited to "the balance of the contract price unpaid at the time of default," the parties intended to exclude from Transamerica's reimbursement only those previous payments made to Rush *in accordance with the provisions of the contract.* It would be unreasonable to believe that Transamerica would have undertaken to complete the defaulted contract if it had known there was a prospect that reimbursement of its costs might be jeopardized by unknown payments mistakenly made to Rush in excess of contract requirements. Transamerica's interests would not have been affected by such payments, of course, if it had held back and let the Government assume the burden of completing the contract, as Transamerica's obligation in that situation would have been limited to reimbursing the Government for the difference between the final cost and what the cost would have been in the absence of the default.

Both parties seem to rely on the decision by the former United States Court of Claims in *Security Insurance Company of*

*Hartford v. United States*, 192 Ct.Cl. 754, 428 F.2d 838 (1970). Although that case dealt with facts somewhat different from those of the present case, the court's discussion is helpful.

The court in *Security* held that the Government could not set off taxes owed to it by a defaulting contractor against retainages accumulated before default and later claimed by a performance bond surety that completed the contract pursuant to its bond. Hence, a performance bond surety that completes the contract has rights superior to those of the Government to retainages accumulated before default, if the retainages are needed to reimburse the surety for its costs. A basic reason for this, according to the court (192 Ct.Cl. at 760–61, 428 F.2d at 841), is that the surety, by electing to complete performance, has conferred a benefit on the Government by relieving it of the task of completing performance itself. The court then included a quotation from the Supreme Court's opinion in *United States v. Munsey Trust Co.*, 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947), stating (among other things) that "a surety would rarely undertake to complete a job if it incurred the risk that by completing it might lose more than if it had allowed the government to proceed" (332 U.S. at 244, 67 S.Ct. at 1604).

■ A payment bond surety is in a different situation. It does not protect the interests of the Government, but instead protects subcontractors, materialmen, and laborers by promising to pay their charges, to the extent of the penal sum, if the contractor fails to pay them. If a payment bond surety pays such creditors of the contractor, it becomes the subrogee of the contractor and, as such, stands in the place of the contractor, with rights to retainages inferior to those of the Government on its claims against the contractor. *See United States v. Munsey Trust Co., supra,* 332 U.S. at 239, 67 S.Ct. at 1601.

■ The defendant correctly states that the court in *Security* dealt only with retained, unpaid sums. The rationale of the decision in *Security*, however, that a performance bond surety which completes a defaulted contract has conferred a benefit on the Government by relieving the Government of the burden of completing the contract, and, accordingly, that the surety should be able to recover its costs without being subject to claims which the Government may have against the defaulting contractor, seems to be applicable to the present case. In other words, Transamerica's right to recover its costs in completing this contract should not be reduced because the Government mistakenly made an excessive payment to Rush before the default.

The defendant further contends that, as the total payments made to Rush and to Transamerica equal the full amount of the contract price, the Government cannot pay anything more to Transamerica. The defendant cites in support of its position the cases of *City of Manassas Park v. United States*, 224 Ct.Cl. 515, 520, 633 F.2d 181, 184 (1980), and *State of Texas v. United States*, 210 Ct.Cl. 522, 531, 537 F.2d 466, 470–71 (1976). Those cases involved government grants, and the Court of Claims held that the Government was bound only by its express undertakings.

The problem in the present case, of course, is to determine just what *were* the Government's undertakings (and those of Transamerica) in the takeover agreement. The court believes that the undertakings were such as to make it improper to grant the defendant's motion for summary judgment.

Before ending the discussion, perhaps it should be emphasized that the $79,810.74 payment to Rush involved here was made mistakenly, and not through a conscious exercise of discretion by the contracting officer. Consequently, such cases as *United States Fidelity & Guaranty Co. v. United States*, 230 Ct.Cl. 355, 676 F.2d 622 (1982), *Royalty Indemnity Co. v. United States*, 208 Ct.Cl. 809, 529 F.2d 1312 (1976), and *Argonaut Insurance Co. v. United States*, 193 Ct.Cl. 483, 434 F.2d 1362 (1970), are readily distinguishable from the present case.

*Conclusion*

For the reasons previously stated, the court concludes that the cross-motions for summary judgment should be, and they are hereby, denied.

IT IS SO ORDERED.