**NATIONAL SURETY CORPORATION,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

No. 92–344C.

United States Court of Federal Claims.

July 18, 1994.

Richard L. Lambe, Seattle, WA, for plaintiff.

Thomas P. McLish, Washington, DC, with whom were Asst. Atty. Gen. Frank W. Hunger and John Manfredonia, for defendant.

## OPINION

ROBINSON, Judge.

This matter is before the court on the parties' cross-motions for summary judgment. Oral argument was held on June 22, 1994.

Plaintiff National Surety Corporation (National), the performance bond surety on a defaulted government construction contract, seeks ten percent of the amount paid to the contractor before its default. National contends that this percentage should have been withheld as retainage, entitling National to recover it to offset the cost of honoring its performance bond. The government counters that it acted within its discretion when it released the retainage.

The court holds that National is entitled to recover as a third-party beneficiary of the retainage provision in the contract. Therefore, the court grants National's motion for summary judgment and denies the government's cross-motion for summary judgment.[1]

### FACTS

1. *The parties.*

The United States Veteran's Administration (VA or government) entered into a construction contract with Dugdale Construction Company (Dugdale) on September 19, 1983.

The VA promised to pay Dugdale $1,081,630 to complete a water distribution system at a VA facility in Fort Harrison, Montana. National acted as surety on performance and payment bonds for this contract. The performance bond guaranteed that the VA would receive the contract work for the contract price.

Dugdale abandoned the contract on October 26, 1984. As a result, the government terminated the contract for default on November 28, 1984. Dugdale's default triggered National's obligation under the performance bond. National honored that obligation by entering into a takeover agreement with the VA and Dugdale on January 15, 1985. National then arranged for completion by another contractor. The VA accepted the completed work on September 6, 1985.

Before it defaulted, Dugdale had been paid $977,417.[2] The takeover agreement provided that National would complete performance for the remaining $126,333 of the contract price. The VA paid this amount to National.[3]

2. *The contract.*

At issue are the provisions addressing retainage. The central language appears in clause G–7(A) (the retainage clause):

G–7. PAYMENT TO CONTRACTOR

Clause 7 of General Provisions (Construction Contract) is supplemented to include the following:

A. Retainage: This contract shall have 10 percent retainage withheld on each progress voucher [installment payment to Dugdale] until the complete project arrow diagram has been approved. Once the schedule has been approved and the Contracting Officer has determined that the Contractor's progress is satisfactory, the Contracting Officer may elect not to withhold any additional re-

---

1. The cross-motions were originally designated as motions for partial summary judgment. They were converted to dispositive motions by the parties' settlement of National's other claims.

2. Amended Complaint ¶ 7; Defendant's Answer ¶ 7. *See* note 4 below.

3. The court notes that these figures do not add up: the total of the amounts paid to Dugdale and National is $1,103,750, which is $22,120 more than the original contract amount. However, the discrepancy does not affect the outcome of this case, which turns only on the amount paid to Dugdale.

tainage. Previous retainage will not be reduced and future payments will be made in full. If during subsequent project updates the Contracting Officer determines that the Contractor's progress is unsatisfactory, he may withhold 10 percent retainage on the current payment request and subsequent payments to protect the interests of the Government and until he again determines that the Contractor's progress is satisfactory.

The government did not withhold retainage from its payments to Dugdale. National claims that the retainage clause obligated the government to withhold ten percent, or $97,742, and seeks to recover this amount.

The retainage clause supplements clause 7 of the form "General Provisions (Construction Contract)" appearing at the beginning of the contract. Clause 7(c) provides:

7. PAYMENTS TO CONTRACTOR

(c) In making such progress payments, there shall be retained 10 percent of the estimated amount until final completion and acceptance of the contract work. However, if the Contracting Officer finds that satisfactory progress was achieved during any period for which a progress payment is to be made, he may authorize such payment to be made in full without retention of a percentage. Also, whenever the work is substantially complete, the Contracting Officer shall retain an amount he considers adequate for protection of the Government and, at his discretion, may release to the Contractor all or a portion of any excess amount. Furthermore, on completion and acceptance of each separate building, public work, or other division of the contract, on which the price is stated separately in the contract, payment may be made therefor without retention of a percentage.

The parties agree that retainage clause G–7(A) superseded clause 7(c).

Two other provisions of the contract are relevant. Clause G–7(B) required Dugdale to submit a schedule of costs for the project. Clause G–8(A) provides:

G–8. SCHEDULE OF WORK PROGRESS

A. The Contractor shall submit with the schedule of costs, as required by "Payment to Contractor" Clause, a progress curve indicating anticipated work pregression [sic] against lapsed contract time, for approval of the Contracting Officer. Submission shall be in quadruplicate on VA Form 08–6159 (Construction Progress Chart) furnished by the Veteran's Administration, and shall be signed by the Contractor. The curve shall start on the date the Contractor receives the "Notice to Proceed" and terminates on the original contract completion date. Both dates shall be indicated on the Construction Progress Chart.

VA Form 08–6159, referenced by clause G–8(A), requires a progress curve that shows the percentage of project work completed by month, without identifying specific tasks completed or their sequence. Dugdale submitted a progress curve on September 29, 1983. Contracting officer John Worster approved it on October 6, 1983, three days after Dugdale received Notice to Proceed.

Also relevant are three guidebooks to contract scheduling that describe "arrow diagrams." The first is U.S. Army Corps of Engineers Publication No. EP 415–1–4, *Network Analysis Systems Guide* (1986) (the Corps guide). Chapter 3 of the Corps guide describes an arrow diagram as a detailed work schedule showing specific tasks and their sequence. The second is The Associated General Contractors of America, *The Use of CPM in Construction* (1976) (the AGC book). This book, which defines an arrow diagram the same way as the Corps guide, contains an essay written by Gerald Neumann, the VA's Director of Construction Program Control. *Id.* at 126–29. Neumann's essay describes the VA's success with using such arrow diagrams to monitor construction projects. The third is VA Publication H–08–11, *VACPM Handbook* (1985, rev'd 1986, 1989), which refers to the AGC book for how to develop arrow diagrams. *VACPM Handbook* at 2.

3. *The takeover agreement.*

The following provisions of the takeover agreement between National, the government, and Dugdale are relevant:

IT IS AGREED THAT:

(4) The surety shall complete the unfinished portion of this contract for the amount of $126,333 and that any additional expenses, costs or obligations not caused by contract changes, modifications or supplements shall be solely their responsibility.

(5) The surety, contractor and the government acknowledge that work in the amount of $974,417 has been performed.[4]

(11) The government agrees to pay the surety the sum of $126,333 for completion of the contract and to pay or deduct for changes, modifications, or supplements issued hereafter.

The parties stipulate that "[the] takeover agreement provided that, in return for the payment of the remaining contract amount, National would complete the unfinished portion of the contract." Stip. Entry Judg. ¶ 4.[5]

### 4. *Procedural history.*

National submitted claims to contracting officer Worster asserting various grounds for relief on October 14, 1986. The VA denied these claims on August 14, 1987. National appealed to this court, but National failed to properly certify its claim; accordingly, this court dismissed National's appeal without prejudice on May 15, 1990. *National Sur. Corp. v. United States,* 20 Cl.Ct. 407 (1990).

National submitted a properly certified claim to Worster on January 24, 1991. The VA never responded or issued a decision. National eventually filed this appeal on May 14, 1992, based on the VA's deemed denial of its claim. 41 U.S.C. § 605(c)(5) (1988).

National originally asserted five claims, including one for the retainage it contends the government should have withheld. The parties settled the other four claims, and filed a Stipulation for Entry of [Partial] Judgment on March 7, 1994. The court granted the parties joint motion for disposition of the

settled issues on April 7, 1994. National's only remaining claim is for $97,742 in retainage, plus interest.

National moved for summary judgment on the retainage issue on March 31, 1993, and the government filed a cross-motion for summary judgment on June 25, 1993. On April 28, 1994, after briefing by the parties, the court requested additional briefing on National's rights if any as a third-party beneficiary under the contract. Oral argument was held on June 22, 1994, after the parties completed this briefing.

### *The Parties' Contentions*

National contends that by failing to withhold as retainage ten percent of each progress payment to Dugdale, the government breached the contract, and National is entitled to recover this ten percent as damages. National relies on the undisputed fact that Dugdale never submitted a detailed arrow diagram of the sort described in the Corps guide. According to National, the retainage clause required that such an arrow diagram be submitted and approved before contracting officer Worster released retainage. National argues that the government should be bound by this mandatory retainage provision, because retainage is intended to protect the surety as much as the government.

The government contends that it had discretion under the contract to withhold retainage or not as it saw fit and, accordingly, that it did not breach the retainage clause. The government relies on *Fireman's Fund Ins. Co. v. United States,* 909 F.2d 495 (Fed.Cir. 1990), as highlighting the importance of such discretion. The government argues that it should be allowed to encourage contractors like Dugdale to perform by releasing retainage as it considers appropriate. The government also points to what it considers the unequivocal language of the contract granting the government discretion. According to the government, the retainage clause did not

---

4. Clause 5 of the takeover agreement suggests that the government only paid Dugdale $974,417, and not $977,417 as National claims. *See also* Worster Decl. ¶ 12 (relying on clause 5). However, the government has admitted that National's higher number is correct. *See* Defendant's Answer ¶ 7.

5. The "Stipulation for Entry of Judgment" was filed by the parties on March 7, 1994 in support of their joint motion to settle National's other claims.

require Dugdale to submit an arrow diagram. Alternatively, the government argues in its briefs that the progress curve Dugdale submitted under clause G–8(A) was an "arrow diagram" within the intended meaning of the retainage clause.

National responds that the plain language of the retainage clause required Dugdale to submit a detailed arrow diagram before retainage could be released, and that the government would have reduced the risk of default by honoring this requirement. National argues that Worster's satisfaction with Dugdale's progress was not enough to justify releasing retainage.

As for whether National can recover for the government's asserted breach, National contends that it can as a third-party beneficiary under *Schuerman v. United States,* 30 Fed.Cl. 420 (1994). National argues that the contract demonstrates the government's intent to benefit National by promising to withhold retainage. National also contends that because it completed performance instead of merely covering the cost of completion, it has a direct claim under *Transamerica v. United States,* 6 Cl.Ct. 367 (1984).

The government contends that even if it breached the retainage clause, National is not entitled to recover as a third-party beneficiary. According to the government, *Fireman's Fund* stands for the proposition that the government has no duty to protect the surety until the surety provides notice of the contractor's default. The government also argues that National is not a third-party beneficiary because the government intended the contract to benefit the public and not National, and because any benefit provided to National by the retainage clause was remote and purely speculative. And even if National was a third-party beneficiary, the government argues, National cannot recover because its rights against the government rise no higher than Dugdale's.

The government further contends that *Transamerica* cannot negative the notice requirement imposed by *Fireman's Fund.* The government also distinguishes *Transamerica* on the ground that National's takeover agreement precludes recovering retainage.

National responds that *Fireman's Fund* involved a claim for equitable subrogation and thus does not apply to this breach of contract suit. Furthermore, says National, *Fireman's Fund* does not apply because there the surety defaulted on the performance bond, while National completed performance. Finally, National argues that it has an equitable claim even without notice because the government breached the retainage clause.

### DISCUSSION

This case is before the court on the parties' cross-motions for summary judgment. Summary judgment is appropriate if there are no genuinely disputed fact issues and the movant is entitled to judgment as a matter of law. RCFC 56. "Only disputes over material facts, or facts that might significantly affect the outcome of the suit under the governing law, preclude an entry of summary judgment." *Schuerman v. United States,* 30 Fed.Cl. 420, 434 (1994) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). And there is no genuine dispute where the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

### A. Breach of contract.

#### 1. The retainage clause.

This case hinges on the proper interpretation of the first two sentences of retainage clause G–7(A), which provide:

> Retainage: This contract shall have 10 percent retainage withheld on each progress voucher until the complete project arrow diagram has been approved. Once the schedule has been approved and the Contracting Officer has determined that the Contractor's progress is satisfactory, the Contracting Officer may elect not to hold any additional retainage.

At issue is whether Dugdale submitted an acceptable "schedule." If so, then contracting officer John Worster had discretion to release retainage to Dugdale as he saw fit. On the other hand, if Dugdale did not submit

a "schedule," then the government breached the contract when Worster failed to withhold retainage.

The parties agree that the "arrow diagram" mentioned in the first sentence of the retainage clause is a type of work schedule. The parties disagree as to (1) whether the "schedule" of the second sentence of the retainage clause is an arrow diagram; and if so, (2) whether Dugdale submitted an acceptable arrow diagram.

"Pure contract interpretation is a matter of law that may be resolved by summary judgment." *Fairchild Indus., Inc. v. United States,* 30 Fed.Cl. 839, 843 (1994). The court must seek "an interpretation that gives reasonable meaning to all relevant portions of the agreement, without rendering any provision useless." *Transamerica Ins. Co. v. United States,* 6 Cl.Ct. 367, 371 (1984); *see also Fortec Constructors v. United States,* 760 F.2d 1288, 1292 (Fed.Cir.1985).

■ First, the court agrees with National that the schedule of the second sentence of the retainage clause is the arrow diagram of the first sentence. This is the only interpretation that gives meaning to the requirement in the first sentence that the government approve an arrow diagram before releasing retainage.

The government asserts that the contract does not require an arrow diagram, relying on Worster's declaration that the reference to an arrow diagram "is inapplicable to this contract, because this contract contained no requirement that Dugdale submit such a document." Worster Decl. ¶ 9. But Worster's declaration is contradicted by the plain language of the contract. The court therefore rejects it:

> The parties are bound by their contract language.... The affidavits' attempts to say otherwise create no genuine issue of material fact that would stand as a bar to the granting of the [summary judgment] motion; at best, those affidavits offer nothing more than plainly erroneous interpretations of unambiguous contract language.

*Ohio Nat'l Life Ins. Co. v. United States,* 11 Cl.Ct. 477, 484, *aff'd per curiam,* 807 F.2d 1577 (Fed.Cir.1986). Worster's declaration offers a plainly erroneous interpretation that is wrong as a matter of law.

The court is no more persuaded by the government's argument that no arrow diagram was required because it was not mentioned elsewhere in the contract than in the retainage clause. It is true that the contract only required approval of an arrow diagram if the government were to release retainage; but the government did release retainage.

The court concludes that the contract required submission and approval of an arrow diagram as a condition precedent to any retainage release.

The next matter to be resolved is what constitutes an arrow diagram for purposes of this contract. The issue is whether a "progress curve," a simple work schedule that Dugdale submitted and Worster approved, is an "arrow diagram." The parties agree that a progress curve is a work schedule that shows the percentage of project work completed by month, without identifying specific tasks or their sequence.

If a progress curve is an arrow diagram, as the government contends in its briefs, then the government had discretion to release retainage upon approving Dugdale's progress curve. But if a progress curve is not an arrow diagram, as National contends, then no arrow diagram was approved, the condition precedent was not met, and the government was not entitled to release retainage to Dugdale.

The contract is silent as to whether a progress curve is an arrow diagram. The court must therefore turn to other evidence of the parties' intent. And when the evidence "is so one-sided that one party must prevail as a matter of law," *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512, summary judgment is appropriate. That is the case here.

■ The government conceded at oral argument that a progress curve is a "totally different thing" than an arrow diagram. This by itself is enough to decide the point in favor of National. However, the government vigorously contested this point in its briefs, so the court now turns to the parties' arguments.

National contends that a progress curve is not an arrow diagram. According to National, an arrow diagram is a detailed work schedule that identifies each task involved in a construction project and the sequence in which the tasks are to be performed. In support, National submitted U.S. Army Corps of Engineers Publication EP–415–1–4, *Network Analysis Systems Guide* (1986) (the Corps guide), which explains how to create such an arrow diagram for a construction project. National contends, and the government does not dispute, that Dugdale never submitted a detailed "arrow diagram" of the type described in the Corps guide.

National further relies on the declaration of Earl Nelson, a construction consultant involved in National's completion of the work after Dugdale's default. Nelson understands an arrow diagram to be such a detailed work schedule. Nelson Decl. ¶¶ 3–5.[6] According to Nelson, it is not unusual for the government to require more than one method of scheduling, such as a simple progress curve and a more detailed arrow diagram, on a single construction project. Furthermore, Nelson declares that a detailed arrow diagram would have provided the VA greater ability to monitor and control Dugdale's work than a simple progress curve. Nelson Decl. ¶¶ 6–7. This explains why such an arrow diagram might have been required.[7]

National's position is strongly supported by two documents indicating that the VA understood an arrow diagram to be as National propounds. The first is the AGC book.

This book, which uses National's definition of an arrow diagram, contains an essay by Gerald Neumann, the VA's Director of Construction Program Control. *Id.* at 126–29. Neumann's essay describes the VA's success with using such arrow diagrams to monitor construction projects. The second is VA Publication H–08–11, *VACPM Handbook* (1985, revised in 1986 and 1989), which refers the reader to the AGC book for how to develop arrow diagrams. *VACPM Handbook* at 2.

These VA documents are highly persuasive admissions by the government that National's interpretation of what constitutes an arrow diagram is the correct one.

National's interpretation is also supported by the use of different terms for the work schedules addressed in the retainage clause and clause G–8(A). The retainage clause refers to an arrow diagram, while clause G–8(A) refers to a progress curve. This suggests that the government understood the arrow diagram and progress curve to be distinct schedules.

However, the government contends in its briefs that the progress curve is an arrow diagram. In support of its interpretation, the government again relies on Worster's declaration. Worster asserts that because the retainage clause did not require an arrow diagram, the progress curve served as an arrow diagram for purposes of the contract. Worster Decl. ¶ 9. But as explained above, the plain language of the contract required the government to approve an arrow diagram before releasing retainage. Worster's con-

---

**6.** In its brief on the third-party beneficiary issue, submitted after briefing on the proper interpretation of the retainage clause had closed, the government challenged the use of Nelson's declaration at summary judgment under the "parol evidence rule." The government relies on *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed.Cir.1988), in which the Federal Circuit stated that "[w]here ... the meaning of a writing is uncertain or ambiguous, and parol evidence is introduced in aid of its interpretation, the question of its meaning should be left to the jury". *Id.* (quoting S. Williston, *A Treatise on the Law of Contracts* § 616 (3d ed. 1961)). Of course, this is not a statement of the parol evidence rule, which blocks consideration of evidence extrinsic to a contract under appropriate circumstances; instead, this statement reflects that genuine and material fact issues should be resolved at trial.

*Beta Systems* does not prohibit the court from *considering* Nelson's declaration; the decision instead bars entry of summary judgment if the declaration and other evidence on file indicate that genuine fact issues remain. *See Beta Systems* at 1183 (considering affidavits and consequently reversing grant of summary judgment); RCFC 56(c). No genuine fact issues remain here.

**7.** Nelson also declares that the VA paid Dugdale substantially more than was justified by the amount of work Dugdale completed, and that had the VA obtained an arrow diagram, it would have been more likely to avoid the overpayment. Nelson Decl. ¶ 7. But these statements are contradicted by clause 5 of the takeover agreement, in which National acknowledges that Dugdale performed work in the value of $974,417, which is only $3,000 less than Dugdale was paid.

clusion, therefore, rests on a faulty premise. Worster's unsupported conclusion is also contradicted by the VA's own publications indicating that it understands an arrow diagram to be considerably more detailed than a progress curve. " '[D]iscredited testimony is not (normally) considered a sufficient basis for drawing a contrary conclusion.... Instead, the [party opposing the motion] must present affirmative evidence in order to defeat a properly supported motion for summary judgment.' " *Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514–15 (citation omitted). Worster's declaration fails to raise a fact issue.

The government also attacks Nelson's declaration as "completely speculative." But the Corps guide and VA publications support Nelson's interpretation.

The government adds that if a relatively complex arrow diagram were required, the contract would have explained what one is instead of "burying" a reference to it in the retainage clause. The government also asserts that because the reference to an arrow diagram was at best ambiguous, if National intended to rely on its interpretation, National should have confirmed it with Worster. Neither of these arguments overcomes the VA's admission in its publications that it understood an arrow diagram to be as National contends.

Simply put, the government has failed to produce credible evidence supporting a definition of an arrow diagram contrary to that set forth in its own publications and in the Nelson declaration.

■ Finally, the government argues that in any event National was not prejudiced by the release of retainage, because National has adduced no proof that it relied on its interpretation of the retainage clause. But National need not prove reliance to recover expectancy damages in the amount of retainage that the government should have withheld. *See, e.g.,* E. Allan Farnsworth, *Contracts,* § 12.1 (2d ed. 1990) (distinguishing between expectation interest and reliance bases for recovery).

Having reviewed the arguments and submissions of the parties and the VA publications, the court holds that the progress curve Dugdale submitted was not an arrow diagram. And no arrow diagram having been submitted or approved, the government breached the contract when it released retainage.

**2. The scope of the contracting officer's discretion.**

The government advances a policy argument in support of its lenient interpretation of the retainage clause that merits separate treatment. According to the government, "public policy requires that the contracting officer be given great leeway in administering the contract, and [ ] courts should not use hindsight to limit the contracting officer's discretion." Br. Supp. Defendant's Cross–Mot. for Partial Summary Judgment at 11. However, the court refuses to allow this concern to undermine the plain language of the contract.

The government's argument is based on *Fireman's Fund Insurance Co. v. United States,* 909 F.2d 495 (Fed.Cir.1990). *Fireman's Fund,* like this case, involved a surety's claim to retainage that it alleged the government had wrongfully released to a contractor who later defaulted. In that case, the United States Court of Appeals for the Federal Circuit found that the government did not breach the construction contract, and reversed this court's decision allowing the surety to recover.

The government relies on the following paragraph from *Fireman's Fund:*

> It is true that retainage is an incentive to complete the contract, but it is equally true that contractors may need full progress payments to finance the work. In this case, the government believed the contract might not be completed unless it released the retainage to alleviate [the contractor's] cash flow problems. It may be that, ideally, the government should hold retainage until the work is substantially complete instead of releasing it when "perhaps fleeting, temporary satisfactory progress during one or a few pay periods is achieved." [Citation omitted.] But the government has considerable leeway in administering its contracts.

During performance, the Government's role is substantially different from that of a mere stakeholder of a final contract payment. The [Government] has an important interest in the timely and efficient completion of the contract work. In furtherance of this interest, the Government contracts for a broad range of rights which are designed to promote continuation of the contract work. These provisions give the Government considerable discretion and flexibility in administering the contract. Public policy supports this flexibility in light of the various unforeseen circumstances which may hinder performance.

*Argonaut Ins. Co. v. United States,* 434 F.2d 1362, 1367, 193 Ct.Cl. 483 (1970); *see also Balboa Ins. Co. v. United States,* 775 F.2d 1158, 1164 (Fed.Cir.1985); *United States Fidelity & Guar. Co. v. United States,* 676 F.2d 622, 628, 230 Ct.Cl. 355 (1982). We are unwilling to read into the contract a limitation on discretion that the parties did not themselves contemplate.

*Fireman's Fund,* 909 F.2d at 498. This paragraph indicates the desirability of allowing the government discretion to release retainage as it considers necessary to help the contractor. It is echoed by Worster in his declaration, where he explains that "I considered the interest of the Government to be better protected by ensuring that Dugdale had the maximum resources to use in its efforts to complete the work." Worster Decl. ¶ 10.

However, the above quoted paragraph from *Fireman's Fund* also indicates that the scope of the government's discretion to promote performance depends on the terms the government has contracted for. This appears most clearly in the last sentence, where the Federal Circuit refuses to "read into the contract a limitation on discretion *that the parties did not themselves contemplate.*" *Id.* (emphasis added). When the government does agree to limit its discretion, *Fireman's Fund* does not support allowing such discretion in breach of the contract.

As explained above, holding the government to the terms of the contract at issue here is also desirable from a policy stand-

point. Nelson's declaration and the VA essay in the AGC book explain that arrow diagrams substantially improve the government's ability to monitor contract performance. The arrow diagram requirement thus provided some assurance to the government and National that any retainage release would be justified.

Furthermore, *Fireman's Fund* does not apply here because that opinion relies on the discretionary retainage clause the government agreed to write out of its contract with Dugdale. The retainage provision in *Fireman's Fund* is identical to that in paragraph 7(c) of the form "General Provisions (Construction Contract)" appearing at the beginning of the contract:

In making such progress payments, there shall be retained 10 percent of the estimated amount until final completion of the contract work. However, if the Contracting Officer finds that satisfactory progress was achieved during any period for which a progress payment is to be made, he may authorize such payment to be made in full without retention of a percentage....

*See Fireman's Fund,* 909 F.2d at 497–98. *Fireman's Fund* holds that this provision leaves the contracting officer with discretion to release retainage. *Id.* at 498. But in this case, the parties agree that clause G–7(A) superseded this provision in the Dugdale contract.

■ This case, unlike *Fireman's Fund,* involves a retainage clause that left the government without discretion to release retainage until it approved an arrow diagram. The government agreed to substitute this clause for the standard discretionary provision. The government cannot now receive the benefit of the discretion that it chose to contract away.

The government promised that it would not release retainage until an arrow diagram had been approved. It is not "hindsight" as the government claims for this court to hold the government to its promise, instead of

bestowing the discretion the government wishes in hindsight it had contracted for.[8]

## B. *Third-party beneficiary.*

Having determined that the government breached the retainage clause, the court must next decide whether National, a third party to the contract, can recover damages for the breach. This question turns on whether National was a third-party beneficiary of the retainage clause.[9]

### 1. The legal standard.

The court recently addressed third-party beneficiary law in *Schuerman v. United States*, 30 Fed.Cl. 420 (1994). *Schuerman* was brought by borrowers against the government agency that guaranteed their loans. The borrowers sought to recover for the agency's alleged breach of its guarantee contract with the lender. The court agreed with the borrowers that they were third-party beneficiaries of the contract, but granted summary judgment for the government on other grounds.

In reaching its decision, the court carefully reviewed its previous opinions relating to third-party beneficiary law. *Schuerman*, 30 Fed.Cl. at 427–34. The court's third-party beneficiary law " 'has been plagued by uncertainties, doctrinal and conceptual difficulties, and confusion....' " *Id.* at 427 (quoting *Ables v. United States*, 2 Cl.Ct. 494, 499 (1983), *aff'd mem.*, 732 F.2d 166 (Fed.Cir. 1984)). The confusion centers on the applicability of the third-party beneficiary test of *Baudier Marine Electronics, Sales & Service, Inc. v. United States*, 6 Cl.Ct. 246, 249

(1984), *aff'd mem.*, 765 F.2d 163 (Fed.Cir. 1985).

*Baudier* sets out a two part test for third-party beneficiary status. The first is whether the contracting parties intended to benefit the third party. *Baudier* at 249. The court in *Schuerman* accepted this part of the *Baudier* test as supported by authority. *See Schuerman* at 428–31. This court agrees that the contracting parties must have intended to benefit the third party for third-party beneficiary status to obtain.

This court also agrees with *Schuerman* in rejecting the second part of the *Baudier* test, which would require that the contract reflect intent to give the third party "the direct right to compensation or to enforce that right against the promisor." *Baudier*, 6 Cl.Ct. at 249. The *Schuerman* court reviewed the authorities cited in *Baudier* and others, and noted that the only apparent support for the second part appears in *Orchards v. United States*, 4 Cl.Ct. 601, *aff'd*, 749 F.2d 1571 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). *See Schuerman*, 30 Fed.Cl. at 428–30. *Orchards* applied § 313 of the Restatement (Second) of Contracts (1981), the source of the second part of the *Baudier* test, to deny third-party beneficiary status to members of the public asserting a government breach of contract. *Orchards*, 4 Cl.Ct. at 609–12. But § 313 only applies to suits by members of the public for consequential damages against promisors who contract to render a public service. *See Schuerman*, 30 Fed.Cl. at 429 (quoting Restatement (Second) of Contracts § 313 comment a, which explains that "[g]overnment

---

8. Another argument for discretion advanced by Worster, but not taken up in the government's briefing, is that government policy during the relevant period was to treat withholding retainage as non-routine and punitive. Worster Decl. ¶ 10. Worster relies on Federal Procurement Temporary Regulation 83 (Sept. 15, 1983) and Office of Management and Budget Policy Letter 83–1 (May 6, 1983). But these documents, like the *Fireman's Fund* opinion, apply to the standard discretionary retainage clause at issue in *Fireman's Fund* and not the mandatory retainage clause in the Dugdale contract. Temporary Regulation 73 justifies the discretionary policy on the ground that it "can be implemented within the present language of" 41 C.F.R. § 1–7.602–7 (1983), the standard contractor payment provi-

sion including the discretionary retainage clause of *Fireman's Fund*. Policy Letter 83–1 explains that § 1–7.602–7 superseded a provision that, like the Dugdale clause, called for mandatory withholding. Thus, these documents do not apply here.

9. On reviewing the briefs, the court observed that neither party carried forward its breach of contract analysis to whether National could recover for any breach. Therefore, the court invited the parties to submit supplemental briefs addressing National's status as a third-party beneficiary of the retainage clause. The parties have now briefed this issue and addressed it at oral argument.

contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries [with no right to recover] unless a different intention is manifested"). Thus, *Baudier's* "[r]eliance on this section of the Restatement ... was inappropriate." *Schuerman,* 30 Fed.Cl. at 429. Several of the court's decisions do not mention the second part of the *Baudier* test, and those that do cite or rely on .the second part "provide no additional support ... other than citing *Baudier* and the precedent cited therein." *Schuerman,* 30 Fed.Cl. at 428 n. 8, 432.

*Schuerman* concluded that:

[T]he second prong of *Baudier* consistently has been misapplied and without analysis has been accepted by the Claims Court and the Court of Federal Claims. The second prong of *Baudier* may be applicable in certain limited circumstances, but the court improvidently adopted this requirement as a per se rule to be employed in all third-party beneficiary cases.... The only support for this requirement derives from the repeated citations to *Baudier.*

*Schuerman,* 30 Fed.Cl. at 428, 432. The court agrees, and adopts the first part of *Baudier* as the test for third-party beneficiary status.

### 2. The retainage clause.

National can recover for the government's breach if the retainage clause "reflects the express or implied intention of [the government and Dugdale] to benefit" National. *Schuerman,* 30 Fed.Cl. at 17. In assessing intent, the court must read the Dugdale contract "with an eye for determining what was the nature of the agreement entered into between the parties, and there is no surer way to find out what the parties meant than to see what they have done." *Fairchild Indus., Inc. v. United States,* 30 Fed.Cl. 839, 843 (1994). Indeed, neither National nor the government has submitted declarations or other evidence of intent, leaving the court to rely solely on the contract language. National and the government agree that this intent issue is ripe for summary judgment.

National quotes *Prairie State Bank v. United States,* 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896), on the intent underlying retainage:

The law upon this subject seems to be, the reserved per cent to be withheld until the completion of the work to be done is as much for the indemnity of him who may be a guarantor of the performance of the contract as for him for whom it is to be performed. And there is great justice in the rule adopted.

*Prairie State Bank* at 239, 17 S.Ct. at 147 (quoting *Finney v. Condon,* 86 Ill. 78, 80–81 (1877)). This recognizes that both the government and National stood to lose if Dugdale defaulted, and both deserved the protection retainage provides. Thus the government and National were twin beneficiaries of the retainage clause.

National also contends that several provisions in the Dugdale contract show the parties' intent to benefit National. The most relevant is the retainage clause itself, repeated here with emphasis added:

Retainage: This contract shall have 10 percent retainage withheld on each progress voucher until the complete project arrow diagram has been approved. Once the schedule has been approved and the Contracting Officer has determined that the Contractor's progress is satisfactory, the Contracting Officer may elect not to withhold any additional retainage. Previous retainage will not be reduced and future payments will be made in full. If during subsequent project updates the Contracting Officer determines that the Contractor's progress is unsatisfactory, he may withhold 10 percent retainage on the current payment request and subsequent payments *to protect the interests of the Government* and until he again determines that the Contractor's progress is satisfactory.

National argues that this retainage clause has two retainage parts: (1) the requirement that the government withhold retainage until it approved an arrow diagram; and (2) a provision allowing the government to choose whether to withhold retainage once it approved the arrow diagram. National notes that the second, discretionary part states the government's intent "to protect the interests

of the Government." According to National, the omission of this statement of purpose from the first, mandatory retainage provision indicates that the government intended the mandatory provision not merely to protect itself, but also to protect National.[10]

An even stronger reason for treating National as a third-party beneficiary appears in the disparity between the government's promise to withhold retainage and the government's interest in having discretion to release retainage. The government agreed to withhold retainage until Dugdale submitted an acceptable arrow diagram. But as the government insists and *Fireman's Fund* bears out, the government would have been better served if it had retained discretion to release retainage to help Dugdale. And if the government wanted to protect itself against Dugdale's default, the government could have done so under discretionary clause 7(c) by choosing to withhold retainage. Yet the government chose to be bound.

The court finds that the government could not have intended to benefit itself when it surrendered its discretion to release retainage. Nor could the government have intended to benefit Dugdale, which retainage would have hurt; nor could it have intended to benefit the public, whose interests in flexible project management were identical with the government's. *See Fireman's Fund*, 909 F.2d at 498 ("Public policy supports [ ] flexibility [in contract administration] in light of the various unforeseen circumstances which may hinder performance."; citation omitted). Thus the court concludes that the government must have intended to benefit National.

None of the government's arguments meet this central point. The government begins by stating that there appear to be no cases where a surety was held to be a third-party beneficiary of a government contract. Yet the Federal Circuit has recognized the possibility that a surety could recover as a third-

party beneficiary under the appropriate circumstances. *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1160 (Fed.Cir.1985); *see also Fireman's Fund*, 909 F.2d at 499 (quoting *Balboa* ).

The government's primary arguments center on its interpretation of *Fireman's Fund*. As explained above, that case does not apply here because it centered on the discretionary retainage clause the government wrote out of its contract with Dugdale. However, the government's continued reliance on *Fireman's Fund* warrants a fuller examination of that decision here.

*Fireman's Fund* involved a construction contract between the government and Westech Corporation; Fireman's Fund was the performance bond surety. Initially Westech's progress was satisfactory. Accordingly, when Westech asked the government to help it with a cash flow problem, the government released the accumulated retainage. But this was not enough to prevent Westech from defaulting. *Fireman's Fund*, 909 F.2d at 496.

Meanwhile, the government had informed Fireman's Fund of nonpayment complaints by Westech's subcontractors and suppliers. Yet Fireman's Fund did not ask the government prior to the default not to make further progress payments to Westech without Fireman's Fund's consent. *Id.*

Fireman's Fund sued to be released from liability on the performance bond to the extent of the retainage released by the government, alleging both contractual and equitable theories before the Federal Circuit. The contractual claim failed because, as explained above, the government did not breach the discretionary retainage clause at issue in that case by releasing retainage. *Id.* at 500. Furthermore, the Federal Circuit found no promise by the government to benefit Fireman's Fund. *Id.* The Federal Circuit's

---

10. National also relies on clause G–5(A): "[n]othing in this contract shall be construed as creating any contractual relationship between any subcontractor and the Government." National argues that the absence of an analogous disclaimer for the surety suggests that the parties intended in the contract to create a contractual relationship with National. But the Federal Cir-

cuit has made it clear that a government contract in itself does not allow the surety contractual rights. *See Ransom v. United States*, 900 F.2d 242, 245 (Fed.Cir.1990).

National also argues that the government intended to benefit National through other provisions in the Dugdale contract. But those provisions do not address retainage.

analysis follows from the discretionary nature of the retainage clause, which indicated the government's intent to look to its own interests and not the surety's.

The Federal Circuit also rejected Fireman's Fund's equitable theory, in part because Fireman's Fund did not notify the government of Westech's default on the performance bond before the government released the retainage. Without notice, the government had no equitable duty not to release the retainage. *Id.* at 498–99.

This notice requirement arose from the nature of Fireman's Fund's claim. By invoking equity, Fireman's Fund asserted its rights as *subrogee* of the contractor Westech. *See Balboa Ins. Co. v. United States,* 775 F.2d 1158, 1160–61 ("[T]he traditional means of asserting a surety's claim is under the equitable doctrine of subrogation."). But subrogation could occur only upon notice that Fireman's Fund intended to assume Westech's rights. Without notice, the government had no equitable basis for discontinuing its payments to Westech. *See Fireman's Fund,* 909 F.2d at 498–99. And Fireman's Fund did not provide notice until after the retainage release, when no monies remained to discharge its obligation.

The government contends that the equitable analysis of *Fireman's Fund* applies here because National did not provide notice before the government released the retainage. But as National points out, whether "notice by the surety triggers the government's *equitable* duty," *Fireman's Fund* at 499 (emphasis added), has no bearing on National's contract right to recover as a third-party beneficiary.

The government also argues that treating National as an intended beneficiary of the Dugdale retainage clause "would stand the role of sureties on its head," because "[b]y definition and agreement the surety protects the government's interest, not the other way around." *Fireman's Fund,* 909 F.2d at 499. This statement appears in the Federal Circuit's explanation of why Fireman's Fund could not rely on the government to protect its equitable interests without notice. *Id.* It is inapplicable on its face to the Dugdale

contract, where the government agreed that it would protect National's interests.

Similarly, the government argues that it intended the retainage clause "to create an incentive to complete the project," *Fireman's Fund* at 498, and not to benefit National. Again this language applies to a discretionary retainage provision that allowed the government to help the contractor by releasing retainage. The government promised that it would not provide such assistance to Dugdale.

The government's final argument based on *Fireman's Fund* is that treating National as a third-party beneficiary would change the result in that case, because Fireman's Fund could then assert third-party beneficiary rights. Here again the government ignores the fundamental difference between the mandatory retainage clause at issue in this case and the discretionary clause of *Fireman's Fund.* National is an intended beneficiary because the government promised to withhold retainage. The government did not so promise Fireman's Fund.

The government's other arguments against treating National as a third-party beneficiary are no more persuasive. First, the government claims that this result would chill contracting officers' discretion. But the government chose to limit its discretion here. The government can avoid similar limits in the future by not agreeing to them.

Next, the government argues that it intended the contract to benefit the public and not National. But "[p]ublic policy supports [ ] flexibility [in contract administration] in light of the various unforeseen circumstances which may hinder performance." *Fireman's Fund,* 909 F.2d at 498 (citation omitted). Thus the public interest in "the timely and efficient completion of the contract work," *id.* (citation omitted), is the same as the government's, and would be furthered by a discretionary retainage provision.

■ The government also challenges National's third-party beneficiary status as based on isolated contract provisions. Yet National can qualify as a third-party beneficiary based on a single contract provision demonstrating intent to benefit National. As

long as the government intended to benefit National by withholding retainage, it is immaterial how many other promises the government made on National's behalf.

The government also argues that the benefit to National from an arrow diagram was incidental. But as explained above, the government could have better monitored Dugdale's work if it had such a detailed work schedule, reducing the risk to the government and National of Dugdale's default. Just as the government stood to suffer delay if Dugdale defaulted, National stood to shoulder the cost of project completion. National was as much and as direct a beneficiary of any provision designed to reduce that risk as the government.

■ Similarly, the government argues that the benefit to National from withholding retainage was remote and speculative, because National would benefit only if: (1) Dugdale defaulted; (2) National had a superior claim to the retainage than the government's; and (3) National could not recover from Dugdale. But upon a contractor's default, the surety does have a superior claim to withheld retainage. *See Prairie State Bank*, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (affirming award of withheld retainage to surety). And the court does not see how the surety could recover withheld retainage from the contractor since the government, not the contractor, holds it. Thus a surety who honors its performance bond benefits from retainage when the contractor defaults, the precise circumstance against which retainage protects. National's benefit from the retainage clause was immediate.

■ Next, the government argues that because clause 3(a) of the Dugdale contract provided contracting officer Worster with discretion to modify the contract "without notice to the sureties," National cannot enforce the contract terms. But while Worster could modify the contract, National can still recover under the modified contract to the extent National remains a third-party beneficiary. Moreover, in the same sentence selectively quoted by the government, clause 3(a) provides that the contracting officer had to make any modification by *written* change order. Clause 3(b) further provides that if he attempted to make an oral modification, it would not be effective unless the contractor confirmed it in writing. Clause 3(c) adds that under no other circumstances should the contracting officer's conduct be treated as modifying the contract. The government provides no writing or other evidence that Worster modified the retainage clause in accordance with clause 3. Under these circumstances, the government's attempted reliance on clause 3 is wrong.[11]

■ The government also argues that because Dugdale did not object to the retainage release, Dugdale and the government implicitly modified the retainage clause. The government cites *Price v. Pierce*, 823 F.2d 1114 (7th Cir.1987), *cert. denied*, 485 U.S. 960, 108 S.Ct. 1222, 99 L.Ed.2d 422 (1988). *Price* relies on the Restatement (Second) of Contracts § 311 (1981), for the proposition that the parties can modify a contract without any intended beneficiary's consent if the contract does not prohibit modification of the parties' duties to the beneficiary and the beneficiary has not yet relied on it. *Price*, 823 F.2d at 1122. But even if this were so, it could not apply because Dugdale and the government did not even attempt to properly modify the contract. Section 311 also provides that the parties' power to vary their duties to an intended beneficiary ends when the beneficiary "manifests assent to [the contract] at the request of the promisor or promisee." Restatement § 311(3). Dugdale requested

---

11. During oral argument, the government belatedly attempted to rely on the "constructive change" doctrine as supporting a *"sub silentio"* modification of the contract. But this doctrine has no relevance to the present dispute. "A constructive change occurs where a contractor performs work beyond the contract requirements, without a formal order under the changes clause, either by an informal order of the government or by fault of the government." *Miller Elev. Co. v. United States*, 30 Fed.Cl. 662, 678 (1994). The doctrine "provides a means for a contractor recovery" under such circumstances. *Id.; see also C. Sanchez & Sons, Inc. v. United States*, 6 F.3d 1539, 1543–44 (Fed.Cir.1993) (applying doctrine). When the doctrine applies, it does so to benefit contractors and not the government. It therefore cannot help the government here.

that National assent to the contract when it asked National to issue its performance bond; and National manifested its assent when it issued the bond. This eliminated whatever power the government may have had to modify the contract through a premature retainage release.

The government challenges National's reliance on *Prairie State Bank*. The government notes that the *Prairie State Bank* surety recovered in equity as a subrogee, 164 U.S. at 232, 17 S.Ct. at 144, and that the part of the opinion National quotes addresses a *pro tanto* discharge rule not at issue in this case. But National relies on *Prairie State Bank* as stating that retainage benefits the surety as much as the government, and not for the application of this principle in that case. The court is struck by the disparity between the government's attempt to limit *Prairie State Bank* to equity cases and its repeated insistence that the equitable analysis of *Fireman's Fund* applies here.

■ Finally, at oral argument, the government argued for the first time that National's only remaining rights against the government arose under the takeover agreement, so National cannot recover as a third-party beneficiary of the original Dugdale contract. However, the takeover agreement did not express or even suggest the parties' intent to alter National's rights as a third-party beneficiary. As explained below, the takeover agreement provided only that National would complete performance in return for the remaining contract balance. It did not provide that National's rights against the government would be limited to this recovery under the takeover agreement. Therefore, absent any evidence of intent in the takeover agreement to the contrary, the court refuses to find that the takeover agreement modifies or supersedes National's rights under the original contract.

None of the government's arguments are persuasive. The court finds that in promising to withhold retainage, the government must have intended to protect National because it was not concerned with protecting itself or the public. National is therefore a third-party beneficiary of the government's promise, and National is entitled to recover for the government's breach of its promise.

### 3. The government's defenses.

The government contends that even if National is a third-party beneficiary of the Dugdale contract, National cannot recover because its rights against the government rise no higher than Dugdale's. According to the government, a third-party beneficiary's rights against the promisor (here the government) are subject to any defenses the promisor has against the promisee (Dugdale). Thus, since the government has paid the retainage to Dugdale and Dugdale cannot obtain a second payment, neither can National. Furthermore, the government contends that because Dugdale breached the contract by defaulting, Dugdale has no right to recover retainage, so neither does National. Finally, the government argues that its breach in failing to withhold retainage followed from Dugdale's breach in failing to submit an arrow diagram, so Dugdale cannot recover for the government's breach and neither can National.

■ The government's reasoning is flawed. First, while a third-party beneficiary cannot recover amounts paid to the promisee in accordance with the contract, this rule does not apply to amounts paid in breach of the contract. If it did, then no surety could ever recover amounts wrongfully paid to the contractor. *Cf. Transamerica Ins. Co. v. United States*, 6 Cl.Ct. 367, 370–72 (1984) (recognizing that under the proper facts a surety could recover such amounts).

■ The government's argument that National cannot recover because Dugdale defaulted is even more perverse. The point of withholding retainage is to protect against default. Accordingly, it cannot be that default bars the surety's recovery.

■ Finally, the government is wrong to say that its breach in releasing retainage was the result of Dugdale's breach in failing to submit an arrow diagram. Submitting an arrow diagram was not a contract requirement, but rather a condition precedent to the government's retainage release. Dugdale did not meet that condition precedent, so the

government breached by releasing retainage; and the government cannot blame Dugdale.

## C. *Other matters.*

Having determined that National can recover as the third-party beneficiary of the retainage clause, the court now addresses National's other theories of recovery. First, National claims that its status as a surety who completed performance, instead of merely indemnifying the government for its costs in securing completion elsewhere, affords National a special right to recovery. Here National relies primarily on *Transamerica Ins. Co. v. United States*, 6 Cl.Ct. 367 (1984). Second, National argues that it has an equitable right to recover despite its failure to notify the government of Dugdale's default before the government released the retainage. The court is not convinced by either of these arguments.

### 1. National cannot recover under the takeover agreement.

National asserts that it has special rights as a surety who completed performance, relying on *Transamerica* and other cases. As a completing surety, National entered into a takeover agreement with the government, and National can sue the government for breach of the takeover agreement.

 However, National cannot recover for the government's premature retainage release under the takeover agreement. The takeover agreement unambiguously states that National was to receive $126,333, the contract balance remaining after the progress payments to Dugdale,[12] in return for completing performance. Clause 11 of the takeover agreement provides "[t]he government agrees to pay the surety the sum of $126,333 for completion of the contract...." And in clause 4, National agrees that "[t]he surety shall complete the unfinished portion of this contract for the amount of $126,333 and that any additional expenses, costs or obligations ... shall be solely their responsi-

bility." These provisions limit National's recovery under the takeover agreement to the contract balance remaining after the government released the retainage. Furthermore, National stipulated in settlement of its other claims relating to this dispute that "[the] takeover agreement provided that, in return for payment of the remaining contract amount, National would complete the unfinished portion of the contract." Stip. for Entry of Judg. ¶ 4. The government paid National the remaining contract amount, and National has no remaining rights under the takeover agreement.

The unambiguous language of this takeover agreement distinguishes *Transamerica*, where the surety invoked a differently worded takeover agreement in an attempt to recover amounts mistakenly overpaid to the contractor. That takeover agreement, unlike National's, provided that the surety was to complete the work "under the original contract in accordance with all the terms and conditions thereof." *Transamerica*, 6 Cl.Ct. at 369. The court reasoned that this provision might allow the surety to recover the overpayments because they were not made in accordance with the contract. *Id.* at 371. The court accordingly denied the government's motion for summary judgment, thereby allowing the surety the chance to prove that the government did not intend to preclude such a recovery when it entered into the takeover agreement. *Id.* at 371–72.

National cannot rely on *Transamerica* because National's takeover agreement does not provide for completion under the terms of the original contract.[13] What the takeover agreement does include is the government's promise to pay the remaining contract balance, and National's promise to complete performance for that amount. National cannot recover retainage under this agreement.

### 2. National cannot recover in equity as Dugdale's subrogee.

 National responds to the government's *Fireman's Fund* arguments that as a

---

12. *See* note 3 above.

13. Clause 2 of the takeover agreement does provide that "[t]he surety will assume all liabilities, rights and remedies granted by law or the [original] contract as though they were the contrac-

tor." But this only subrogates National to Dugdale's rights; and Dugdale having received the retainage, National cannot recover it from the government as Dugdale's subrogee.

surety who completed performance, it has an equitable right to recover despite its failure to notify the government of Dugdale's default prior to the retainage release. As explained above, National's theory is, in essence, that it is Dugdale's subrogee. This argument is inappropriate because Dugdale has already received the retainage National claims. Furthermore, "only notice by the surety triggers the government's equitable duty." *Fireman's Fund,* 909 F.2d at 498–99. National cannot recover in equity.[14]

### CONCLUSION

The court grants National's motion for summary judgment and denies the government's cross-motion for summary judgment. The Clerk will order the government to pay National $97,742 plus interest accrued from January 24, 1991, the date contracting officer Worster received National's properly certified claim. 41 U.S.C. § 611 (1988); *KDH Corp. v. United States,* 23 Cl.Ct. 34, 39 (1991). No costs.

---

**14.** At oral argument, National claimed a right to an equitable recovery under an unspecified theory other than subrogation. However, National did not proffer any authority for such a recovery. And in any event, the government had no equitable duty to National absent notice. *See Fireman's Fund,* 909 F.2d at 498–99.